## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Lisa Kelley, as trustee for the Heirs and Next of Kin of Maurice Kimball, <br><br> Plaintiff, <br><br> v. <br><br> Correctional Officer Evan Pulford, Officer Valerie Hauser, Officer Kaleena Wiens, individually and in their official capacity, and Brown County Sheriff Rich Hoffman, individually and in his official capacity, <br><br> Defendants. | Case No. 18-cv-02805 (SRN/TNL) <br><br><br><br> **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

DeAundres D. Wilson, Wilson Law Office, 1622 West Lake Street, Minneapolis, MN 55408, for Plaintiff.

Jason M. Hiveley and Stephanie A. Angolkar, Iverson Reuvers Condon, 9321 Ensign Avenue South, Bloomington, MN 55438, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion for Summary Judgment [Doc. No. 27] and the Motion to Exclude Expert Testimony [Doc. No. 32] filed by Defendant Correctional Officers Evan Pulford, Valerie Hauser, and Kaleena Wiens, and Brown County Sheriff Rich Hoffman. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS** Defendants' motion for summary judgment in its entirety, and **DENIES as moot** Defendants' motion to exclude expert testimony.

1

## I.     BACKGROUND

On the morning of July 10, 2016, Maurice Kimball was booked into the Brown County Jail. At the time of booking, Kimball displayed symptoms of methamphetamine intoxication, and Brown County correctional officers placed him in a holding cell for observation. Approximately six hours later, the officers found Kimball lying face-up on the floor, and noticed blood on his bed. The officers called an ambulance and Kimball was transported to the hospital. Several days later, on July 12, 2016, Kimball passed away due to complications from methamphetamine toxicity.

Plaintiff Lisa Kelley, as trustee for Kimball's heirs and next of kin, originally brought this action under 42 U.S.C. § 1983 against Brown County Sheriff Rich Hoffman, several New Ulm police officers involved in Kimball's arrest, and three Brown County correctional officers involved in Kimball's detention. After a series of stipulated dismissals,[1] the remaining defendants are Brown County Sheriff Rich Hoffman and Brown County Correctional Officers Evan Pulford, Valerie Hauser, and Kaleena Wiens (collectively, "Defendants"). Against the remaining defendants, Kelley alleges substantive due process violations under the Fourteenth Amendment; a policy, custom, or practice claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); and a wrongful death claim under Minnesota law. (Compl. [Doc. No. 2].)

---

[1] By the parties' stipulation, all claims against Defendant New Ulm Police Officers Jeremy Reed, Erik Byro, and T.J. Ibberson were dismissed, and the City of New Ulm was joined as a defendant. (Order [Doc. No. 23].) Subsequently, all claims against the City of New Ulm were dismissed by stipulation. (Order [Doc. No. 26].)

Defendants moved for summary judgment, arguing that Kelley's due process claim is barred by qualified immunity, that Kelley has failed to establish a *Monell* claim, and that Kelley's wrongful death claim fails because the officers are entitled to official immunity and Kimball's death was not foreseeable. Defendants also moved to exclude the testimony of Kelley's expert, Dr. John Stark.

### A. Kimball's Arrest

On the evening of July 9, 2016, New Ulm Police Department officers were dispatched to Jenna Fischer's apartment. The Brown County alcohol and treatment court had received reports that an unknown male had moved into Fischer's home, in possible violation of her conditions with that court. (Angolkar Aff. [Doc. No. 30], Ex. 1 ("Reed Dep."), at 22-23.) Sergeant Jeremy Reed and Officers Sara Schlingmann, T.J. Ibberson, and Erik Byro entered Fischer's home with her. (Reed Dep. 27; Angolkar Aff., Ex. 3 ("Byro Dep."), at 9-10; Angolkar Aff., Ex. 4 ("Ibberson Dep."), at 10-11.)

As Sergeant Reed entered the apartment, he saw Maurice Kimball seated in a recliner and smelled marijuana. (Reed Dep. 25-26.) Sergeant Reed asked Fischer about the smell, and she told him that she did not have any drugs in the house. (*Id.* at 27-28.) When Sergeant Reed questioned Kimball, Kimball stated that "he needed a break"; he produced a small amount of marijuana and a pipe from his pockets, gave these to Sergeant Reed, and asked to be left alone. (*Id.* at 29.) Sergeant Reed described Kimball as "[f]idgety" and "[n]ervous," his hands and feet "moving around a lot." (*Id.*) Kimball's speech was "clear," and he did not have a problem enunciating or verbalizing. (*Id.* at 30.) But Kimball was

3

sweating—"the longer . . . the interaction went, . . . you could see sweat start rolling, pouring, puddling off his head." (*Id.*)

Sergeant Reed believed Kimball's demeanor was a sign that more drugs were present in the room. (*Id.*) He asked Kimball how much methamphetamine he was using, and Kimball "put up his defenses" and "became argumentative." (Angolkar Aff., Ex. 2 ("Reed Incident Report"), at 1.) Kimball denied using methamphetamine. (Reed Dep. 41.) Sergeant Reed asked Kimball to empty his pockets, and Kimball produced a large amount of U.S. currency from his pocket. (Reed Incident Report 1.) Sergeant Reed also searched a backpack near Kimball, and found a small bundle of methamphetamine, a digital scale, packages of plastic bags used in packaging drugs for sale, and other drug paraphernalia. (*Id.* at 2; Reed Dep. 42-44.) Throughout the search, Kimball was "upset, agitated, and angry." (Reed Dep. 45.) After searching the backpack, Sergeant Reed concluded that Kimball was upset and angry because he was distributing and selling methamphetamine. (*Id.* at 44-45.)

Kimball was placed under arrest. Officer Ibberson testified that Kimball "pulled away" when Sergeant Reed attempted to handcuff him, and it took both officers to handcuff him. (Ibberson Dep. 14-15.) An officer pat searched Kimball prior to placing him in Officer Ibberson's car. (*Id.* at 16.) Sergeant Reed testified that at the time of arrest, Kimball was able to "hold a discussion," verbalize, and walk on his own. (Reed Dep. 15.) He did not display indicators that "he was suffering from a medical emergency," such as "[l]oss of functions," inability to communicate, to talk, or to put sentences together, or loss of control over body, bladder, and bowel movements. (*Id.* at 15-16.)

4

### B.     Booking at the Brown County Jail

### 1.     Arrival and Pat Search

Officer Ibberson drove Kimball to the Brown County Jail, arriving at midnight. Once at the jail, Kimball was able to step out of the vehicle and follow Officer Ibberson's commands. (Ibberson Dep. 17.) Officer Ibberson described Kimball's movements as "[j]ittery, like he was at Jenna Fischer's." (*Id.* at 18.) Based on Kimball's "jitteriness," Officer Ibberson believed he was under the influence of a stimulant, and he believed the most likely stimulant was methamphetamine, "the common drug" in the area. (*Id.* at 19.)

Video from the Brown County Jail's sally port corroborates Officer Ibberson's description of Kimball's demeanor. Camera 4 shows Officer Ibberson pull into the jail's sally port, and shows Kimball stepping out of the vehicle unassisted. (Angolkar Aff., Ex. 5 ("Jail Video"), Camera 4, at 12:01:40.) Officer Ibberson crossed the room with Kimball, and they waited outside a secured door. (*Id.*) The video shows Kimball standing, bouncing foot-to-foot and twitching his shoulders and head, until Correctional Officers Pulford and Hauser opened the door and led Kimball inside. (*Id.* at 12:01:46-02:00; *see* Pulford Dep. 29 (identifying Officers Ibberson, Pulford, and Hauser in the video).)

Once inside, Officer Pulford performed a pat search of Kimball. Officer Pulford testified that during the pat search, Kimball was "[m]oving a little bit," and "sweating a little bit at that point and just kind of jerky with his movements in coming in." (Pulford Dep. 19.) "[H]e was not combative yet, but to the point where it appeared he was getting a

5

little agitated with the process of coming into the jail."[2] (*Id.*) Officer Pulford stated that Kimball's "behavior . . . was . . . consistent with somebody that was under the influence of methamphetamine." (*Id.*; *see also id.* at 23 (describing Officer Pulford's understanding of the indicators of methamphetamine intoxication, which included "[t]he fidgety, the twitching, the sweating," and inability to make fluid movements).) The pat search did not reveal any contraband or drugs. (*Id.* at 19-20.) Kimball was led into an elevator and up to the jail's booking room. Surveillance video shows Kimball fidgeting in the elevator, rocking forward and back, with his arms crossed and his shoulders hunched forward slightly. (Jail Video, Camera 6, at 12:04:02-26.)

### 2. Booking Sheet and Medical Screening Form

In the booking room, Officers Ibberson, Pulford, and Hauser filled out paperwork with Kimball. Officer Wiens was not in the booking room, but was able to watch the officers and Kimball through a camera feed in the jail's control tower. (Angolkar Aff., Ex. 10 ("Wiens Dep."), at 17.) Officer Hauser was the ranking officer, and supervised Officers Pulford and Wiens. (*Id.* at 14.) Officer Hauser filled out Kimball's booking sheet and a medical screening form. (Hauser Dep. 18, 23.)

---

[2] Officer Pulford clarified in his deposition that Kimball was not "aggressive" during the pat search, but "he was not 100 percent compliant, where he was more – you could see that he was starting to get upset in some of his movements. So agitated maybe would be the best way to describe [it]." (Pulford Dep. 25.) By "not 100 percent compliant," Officer Pulford was referring to "just clenching, not being fully relaxed while I did the search." (*Id.* at 26.)

The booking sheet notes that Kimball was not strip-searched. (Angolkar Aff., Ex. 9 ("Booking Sheet").) The booking sheet contains a list of reasons that permit officers to conduct a strip search of an arrestee. (*Id.* at 2.) One possible reason is "[c]urrent charge(s) or previous conviction(s) for . . . possession of drugs." (*Id.*) Notwithstanding that Kimball was arrested on a "[c]ontrolled substance charge," Officer Hauser wrote "Pat Search Only" on the booking sheet, and the officers did not conduct a strip search. (*Id.* at 3; Hauser Dep. 18-21.) In her deposition, Officer Hauser explained that although Kimball's charge would qualify for a strip search "[a]ccording to the sheet," she believed that "even though the sheet states it that way, [the charge alone] doesn't necessarily mean you always have enough to do the strip search . . . and I didn't have any other current knowledge that would have given me reason for a strip search." (Hauser Dep. 20-21.) When pressed regarding what would qualify as sufficient reason for a strip search, Officer Hauser testified that if Kimball had been known to smuggle contraband, she may have signed off on a strip search. (*Id.* at 21-23.) But Kimball was not known to her to be a smuggler. (*Id.* at 23.)

On the medical screening form, line four indicates that Kimball "appear[ed] to be under the influence of alcohol/drug," specifically "[m]eth." (Angolkar Aff., Ex. 8 ("Medical Screening Form"), at 2.) In addition, line five states that there were no "visible signs of alcohol/drug withdrawal symptoms." (*Id.*) And line eight, which prompts for "other observations which may be of concern," states "sweating excessively and twitching." (*Id.*) Lines one through eight on the medical screening form are typically filled out by correctional officers, not the arrestee, based on the officers' observations or on

information from the arresting officer. (Pulford Dep. 21-22.) Officer Hauser made these entries on Kimball's medical screening form. (Hauser Dep. 23.)

At her deposition, Officer Hauser explained why she indicated on the form that Kimball was under the influence of methamphetamine. Officer Hauser had "visual indicators that [Kimball] was under the influence," because he was "sweating" and "twitching." (*Id.* at 24, 30-31.) She believed Kimball was specifically under the influence of methamphetamine because "[t]he arresting officer told me . . . [h]e had been using meth." (*Id.* at 24.) Officer Ibberson testified that he believed Kimball was under the influence of a stimulant "based on how jittery he was," and that he believed the stimulant was methamphetamine because "that's the common drug in our area." (Ibberson Dep. 19.) Accordingly, Officer Ibberson told the correctional officers that Kimball had been using methamphetamine. (*Id.* at 19-20.) Officer Ibberson did not tell the officers that Kimball admitted to using methamphetamine, or how much methamphetamine Officer Ibberson thought Kimball might have used, or why Officer Ibberson thought Kimball had been using methamphetamine. (Hauser Dep. 60-61.) Additionally, Officer Ibberson indicated "that [Kimball] had been using meth, and detox would not take him." (*Id.* at 65.)

Because Kimball appeared intoxicated, Officer Hauser did not offer him the phone call arrestees are generally entitled to at booking. (Medical Screening Form 5.) Officer Hauser wrote on the medical screening form that Kimball was not offered a phone call because he was "intoxicated." (*Id.*; Hauser Dep. 25.) Although pressed at her deposition to admit that she believed Kimball was "too intoxicated" to make a phone call, Officer Hauser explained that she "wasn't denying him [a phone call]," and did not offer the call "as a

8

courtesy." (Hauser Dep. 25.) She believed that "[s]ometimes when people are under the influence, they want to wait." (*Id.*) Similarly, Officer Pulford explained that "if you're making a phone call when you're under the influence of either drugs or alcohol, generally we try to let them sober up to make that call so they can better articulate and explain what's going on, because a lot of times they don't remember or they can't get ahold of somebody at midnight, and you generally get one free phone call." (Pulford Dep. 29-30.) Officer Pulford admitted that Kimball was able to have a "coherent conversation" and "probably could have" made a phone call, but he believed it would be better to "offer that phone call at a later time." (*Id.* at 30-31.)

### 3. The Officers' Belief that Kimball was Intoxicated, but Not Suffering a Medical Emergency

At the time of Kimball's booking, all the officers present believed Kimball was under the influence of something, and all but Wiens believed that something was methamphetamine. Officer Hauser testified that she had "visual indicators that [Kimball] was under the influence," because he was "sweating" and "twitching." (Hauser Dep. 24, 30-31.) She believed Kimball was specifically under the influence of methamphetamine because "[t]he arresting officer told me . . . [h]e had been using meth." (*Id.* at 24.) Likewise, Officer Pulford testified that Kimball was able to communicate coherently, but appeared to be intoxicated. (Pulford Dep. 22.) Officer Pulford believed Kimball had used methamphetamine because his behavior—"fidgety, the twitching, the sweating"—was "consistent with almost anyone who had recently used meth," and because "we were informed that he had recently used meth." (*Id.* at 23-24.) Officer Wiens, who was not

present in the booking room but was watching the video feed, testified that she believed Kimball was under the influence "[o]f something," but stated that "at the time, I did not know he was under the influence of meth. I didn't know what he was on." (Wiens Dep. 58.)

But none of the officers believed Kimball was suffering a medical emergency. Officer Pulford testified that Kimball "looked consistent with somebody that had used methamphetamine and that was not in any sort of a medical emergency." (Pulford Dep. 32.) Officer Hauser testified that Kimball was not going unconscious, was giving coherent answers to questions, did not appear to be hallucinating, was not having seizures, and was not vomiting. (Hauser Dep. 56.) Moreover, no one had to carry Kimball to his cell, and he was coherent and cooperative. (*Id.* at 30, 61.)

Similarly, Officer Wiens testified that "it didn't appear to be an immediate medical emergency." (Wiens Dep. 40.) But after reviewing the video feed from the booking room during her deposition, Officer Wiens testified that she believed Kimball should have had medical attention. (*Id.* at 58.) She stated "I do believe at that time he needed – probably needed – at least call the ER and find out." (*Id.* at 64.) Given that Officer Wiens' observations of Kimball's booking on July 10 were solely through the same video feed that she reviewed during her deposition, counsel pressed her to reconcile the inconsistency between her opinion at the time of booking and after reviewing the video again. (*See id.* at 60-66.) Officer Wiens explained, "watching the video . . . now, yes, he should have had medical attention. However, back then, we didn't know the extent to it. So that's why we put him in the holding cell, so we can observe him." (*Id.* at 65.) Thus, Officer Wiens'

testimony appears to be that at the time of Kimball's booking, she did not think he was in immediate medical distress; but in hindsight, she should have sought medical attention.

The video recording from the booking room also indicates that Kimball displayed symptoms of methamphetamine intoxication, but did not appear to be experiencing a medical emergency. Kimball spent much of his time in the booking room seated at the edge of a bar-height stool, arms folded across his chest and hunched forward slightly. (Jail Video, Camera 8, at 12:04:44-07:12.) He bounced his feet against the stool's footrest, stomped his foot on the floor, and appeared to shake slightly. (*Id.* at 12:04:44-06:18.) Occasionally, Kimball took deep breaths, which calmed his twitching and shaking. (*Id.* at 12:06:18-26.) While Kimball completed paperwork at the booking room counter, the video shows him standing upright, and neither fidgeting nor twitching. (*Id.* at 12:07:17-33.) After he finished signing the papers, Kimball leaned against the counter, and can be seen bouncing his leg, twitching his shoulder and head, and flexing his hands. (*Id.* at 12:08:12-09:03.) Kimball was then directed to the shower stall in the booking room, and showered unassisted. (*Id.* at 12:09:27-12:54; Pulford Dep. 17.) Once he was showered and changed into new clothes, he resumed sitting on the stool. Unlike before the shower, he sat fully in the chair, his arms and legs uncrossed. (Jail Video, Camera 8, at 12:16:48-52.) Kimball continued to flex his hands, bounce his feet against the stool, and twitch at the shoulder until the officers escorted him, unassisted, to the jail's holding cell. (*Id.* at 12:16:52-17:28.)

Officer Wiens, who observed Kimball via the video feed in the control tower, noted Kimball's "shaking of the legs" and "[s]haking of the arms," and that he was "[v]ery cooperative and did what he was asked to do[, l]ike sign the paperwork." (Wiens Dep. 40.)

She testified that visibly shaking on the camera feed is a "common theme" for arrestees, due to anxiety, though she deemed Kimball's movements at times "excessive." (*Id.* at 41, 53.) And Officer Wiens described Kimball's behavior as "a little standoffish," but "[o]ther than that, he's standing like he's -- his behavior right there is showing me that he's just like everybody else that comes into the jail." (*Id.* at 51.)

### C.      Observations of Kimball in the Holding Cell

After leaving the booking room, Kimball was placed alone in a holding cell, so that he could be moved to the general population once he was sober. (Hauser Dep. 15.) Because the jail does not have cameras in its holding cells, the only information about his demeanor comes from an activity log filled out by the correctional officers, the officers' incident reports, and their depositions. Officers Pulford, Hauser, and Wiens primarily observed Kimball from the jail tower, which has a window overlooking the jail's holding cells. (Pulford Dep. 37; Hauser Dep. 43-44; Wiens Dep. 10.) From the tower, the officers could see the entire holding cell, except under the bed. (Hauser Dep. 44-45.)

From 12:30 am to 3:31 am, the activity log entries by Officers Hauser and Pulford note that Kimball was simply "laying on left side" or "laying on right side." (Angolkar Aff., Ex. 11 ("Activity Log"), at 2.) And one entry—at 1:26 am—notes that Kimball "[a]ppears to be drinking water." (*Id.*) Officer Hauser testified that from 1:00 am to 3:30 am, she did not see anything that made her believe Kimball had a serious medical issue. (Hauser Dep. 58.) Similarly, Officer Pulford testified that until 4:00 am, he did not see any aggressive or concerning behaviors, and he did not see anything that would indicate that he should contact a nurse or doctor. (Pulford Dep. 40.) Officer Pulford did not see

Kimball put anything in his mouth or dig around in his clothing, and he observed Kimball getting up and drinking water "throughout a long period of time." (*Id.* at 40-41.) Notably, Officer Wiens finished her shift at 3:00 am. (Wiens Dep. 22.)

Then, according to the activity log, Kimball become more active. At 3:47 am, Officer Hauser recorded that Kimball "appears to be kicking the air." (Activity Log 2.) Officer Pulford recorded that Kimball was "kicking legs in the air" at 3:57 am, and "kicking both feet in the air" at 4:01 am. (*Id.*) Officer Hauser recorded that Kimball was back to "[l]aying on left side" at 4:28 am. (*Id.*)

At 4:30 am, Officer Hauser called the New Ulm Medical Center's emergency room. (*Id.*) She asked the nurse "at what point in time did I need to be concerned about someone who is high on Meth." (*Id.*) She "informed the nurse [that] Kimball was drinking water, punching and kicking the air." (*Id.*) The nurse told Officer Hauser that "as long as he was coherent and not running a fever he was going to twitch." (*Id.*; Angolkar Aff., Ex. 13, at 2.) Officer Hauser testified that the call was "[p]recautionary," because by 4:30 am Kimball had been "kicking the air and kind of just acting violent"—specifically, by kicking the wall and punching the air. (Hauser Dep. 48-49.) But Officer Hauser did not take Kimball's temperature, and did not talk to him to determine whether he was coherent. (*Id.* at 50-51.) Rather, Officer Hauser testified that she did not check if Kimball had a fever "[b]ecause he was drinking water and he was up moving around," and because she "didn't take it as direction from the nurse." (*Id.* at 53.) And Officer Hauser believed Kimball was coherent because "[h]e was up and moving around. He looked like he was coherent." (*Id.* at 50.) Officer Hauser testified that she took the nurse's instruction as "[p]recautionary," not "as

direction." (*Id.* at 53-54.) Officer Hauser continued to check on Kimball from the jail tower, but never took his temperature. (*Id.* at 54-55.) Officer Pulford was aware of the call to the nurse. (Pulford Dep. 51-52.)

Beginning at 4:37 am, the officers recorded observations of Kimball more frequently. At 4:37 am, Officer Hauser noted that Kimball "appears to have spit on floor." (Activity Log 2.) At 4:54 am, he was "laying on stomach, moving legs"; then at 4:59 am, he was "laying on left side." (*Id.*) Twenty minutes later, he was "up getting water." (*Id.*) At 5:26 am, Kimball was "sitting on bed rocking," and at 5:32 am he "kicked wall." (*Id.*) Then, at 5:48 am, Officer Pulford recorded that Kimball was "laying on cell floor." (*Id.*) At 5:52 am, he was "standing in cell." (*Id.*) At 6:00 am, Officer Pulford observed Kimball "laying on floor" again. (*Id.*) At 6:03 am, he recorded that Kimball was still "laying on floor," but he "can clearly see chest rising." (*Id.*) At 6:05 am, Kimball "moved both feet." (*Id.*) At 6:10 am, Officer Pulford could "see chest rising, moving feet, eyes opening and closing." (*Id.*) Officer Pulford testified that during this time, Kimball "was still fine," and he did not believe that Kimball's physical movements indicated an immediate, serious medical condition. (Pulford Dep. 42, 51.)

Officer Pulford's next entry was at 6:32 am, and recorded that Kimball was "on floor, blood found on the bed [New Ulm Police Department] called and Allina [Ambulance Service]." (Activity Log 2.) Officer Pulford testified that he had just completed a round checking on all the jail's cells, and he still had the flashlight he used for the jail check in his hand. (Pulford Dep. 43.) From the jail tower, he shined the flashlight across Kimball's cell, and saw "some sort of vomit or a clear liquid mixed with some blood on the bed." (*Id.*

14

at 43.) He did not see blood on the floor or on Kimball, and testified that it did not appear to be "a large pool of blood, but it looked like it was blood mixed with some sort of vomit or clear liquid." (*Id.* at 44-45.)

Officer Pulford testified that prior to seeing blood on the bed, he had not seen any signs indicating that Kimball needed immediate medical care. (*Id.* at 50.) Officer Pulford also explained that "given the circumstances of him at that point seeming to be moving less than what he was previously . . . , I started to consider it to be more of a medical issue." (*Id.* at 45.) Similarly, Officer Hauser testified that she did not believe Kimball needed immediate medical care until she observed the blood on the bed. (Hauser Dep. 63.)

Officer Pulford called dispatch to arrange an ambulance, and called to notify Sergeant Cassie Sandmann. (Pulford Dep. 48.) Officer Pulford testified that when he called Sergeant Sandmann, he did not know that Kimball was overdosing: "[E]ven at that time I didn't know that that's what was happening. I'm not a medical trained professional, so I didn't know that that's what was going on." (*Id.* at 33-34.) Meanwhile, Officer Hauser opened the holding cell door and attempted to talk with Kimball. (*Id.* at 48-49.) Officer Hauser testified that Kimball was lying on the floor, on his back. (Hauser Dep. 64.) Officer Byro arrived to assist Officer Hauser, and both entered Kimball's cell together to perform first-aid. (Pulford Dep. 49; Angolkar Aff., Ex. 17 ("Byro Incident Report"), at 2.) Shortly after, New Ulm Police Officer Sara Schlingmann arrived to assist. (Pulford Dep. 49; Byro Incident Report 2; *see* Jail Video, Camera 7, at 06:20:00-6:25:00.) At 6:37 am, paramedics arrived and removed Kimball from the holding cell. (Activity Log 2.)

The officers found two baggies of what appeared to be methamphetamine in the cell. Officer Byro testified that when he and Officer Hauser entered the cell, Officer Hauser pointed out a clear bag containing a white substance near Kimball's right arm. (Byro Dep. 17-19.) Officer Hauser's incident report describes finding an "open dime baggie of a crystal white/ clear substance." (Angolkar Aff., Ex. 13, at 2.) Officer Byro gave the bag to Officer Hauser for safe-keeping, and returned to the jail to retrieve it after accompanying Kimball to the hospital. (*Id.*; Byro Dep. 19-20.) When Officer Byro returned for the bag, he tested the substance inside; the substance tested positive for methamphetamine, and was placed in evidence. (Byro Dep. 20.) Officer Pulford testified that Sergeant Sandmann found a second bag later, while cleaning the cell. (Pulford Dep. 52.) Sergeant Sandmann's incident report states that she found the second bag under the bed, at 10:35 am. (Aff. DeAundres Wilson ("Wilson Aff.") [Doc. No. 39-2], Ex. 23.)

Based on the bags of methamphetamine found in the cell, Officer Pulford concluded that Kimball had ingested methamphetamine while in the cell. (Pulford Dep. 50.) He based this conclusion on "the general course of events of . . . the progression starts getting where . . . he was laying, laying, laying, laying, and then appears to begin to ramp himself up or become more physical, more moving." (*Id.* at 51.) Likewise, Defendants' expert, Dr. Richard Kingston, opined that "Mr. Kimball consumed a massive overdose of methamphetamine from contraband that he successfully smuggled into jail during his arrest and incarceration. . . . [M]ore likely than not, his consumption was shortly before his demise." (Angolkar Aff., Ex. 19 ("Kingston Report"), at 15.)

Kimball was taken to the New Ulm Medical Center, and began actively seizing while in the ambulance. (Angolkar Aff., Ex. 15 ("Medical Examiner's Report"), at 2.) He was later transferred to the Abbott Northwestern Hospital in Minneapolis. (Angolkar Aff., Ex. 14, at 44.) He passed away on July 12, 2016. (*Id.* at 47.) The Hennepin County Medical Examiner's Office concluded that the cause of death was complications of methamphetamine toxicity. (Medical Examiners Report 2.)

## II.    DISCUSSION

### A.    Qualified Immunity

Qualified immunity protects government officers from § 1983 liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). Thus, the Court must perform a two-part analysis to determine if qualified immunity applies: (1) decide whether the facts show the violation of a constitutional or statutory right, and (2) determine whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). The Court may analyze either step first. *Id.* at 236. Qualified immunity "is an *immunity from suit* rather than a mere defense to liability . . . [and] it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity is a question of law for the court to decide. *Littrell v. Franklin*, 388 F.3d 578, 584 (8th Cir. 2004).

### B.   Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When analyzing qualified immunity at summary judgment, the court should not "deny summary judgment any time a material issue of fact remains on the [constitutional violation] claim [because to do so] could undermine the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *O'Neil v. City of Iowa City*, 496 F.3d 915, 917 (8th Cir. 2007) (quoting *Saucier*, 533 U.S. at 202) (internal quotation marks omitted) (alterations in original). Instead, "the court must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe [them].'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (alterations in original).

Although the moving party bears the burden of establishing the lack of a genuine factual dispute, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted).

Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### C.   Alleged Violations of the Fourteenth Amendment

The Court's analysis begins and ends with the first step in the qualified immunity inquiry: whether the facts show the violation of a constitutional or statutory right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Kelley asserts that Officers Pulford, Hauser, and Wiens violated Kimball's Fourteenth Amendment substantive due process rights by failing to provide adequate medical attention. The Eighth Circuit has held that pretrial detainees, like Kimball, have a clearly established constitutional right "to be free from deliberately indifferent denials of emergency medical care." *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017). A plaintiff asserting a deliberate indifference claim must show (1) that he "suffered from an objectively serious medical need," and (2) that one or more defendants "had actual knowledge of that need but deliberately disregarded it." *Id.* at 425 (quoting *Bailey v. Feltmann*, 810 F.3d 589, 593–94 (8th Cir. 2016)).

The first prong of the deliberate indifference analysis is an objective inquiry, and is satisfied if the detainee's medical need "is supported by medical evidence, such as a physician's diagnosis, or is 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Bailey*, 810 F.3d at 594). The second prong is a subjective inquiry, and imposes "an extremely high standard that requires a mental state of 'more . . . than gross negligence.'" *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir.

2016), *as amended* (Mar. 4, 2016) (quoting *Fourte v. Faulkner Cty.*, 746 F.3d 384, 387 (8th Cir. 2014)). This standard is satisfied only by a showing of "a mental state akin to criminal recklessness"; neither "negligence nor gross negligence are sufficient." *Ryan*, 850 F.3d at 425 (citing *Thompson v. King*, 730 F.3d 742, 746–47 (8th Cir. 2013)). A plaintiff may prove the defendant's mental state "through circumstantial evidence, as 'a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the [medical need] was obvious.'" *Id.* (quoting *Vaughn v. Gray*, 557 F.3d 904, 908–09 (8th Cir. 2009)) (alteration in original). Because liability for damages for a federal constitutional tort is personal, "each defendant's conduct must be independently assessed." *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006).

### 1.    Objectively Serious Medical Need

The first threshold Kelley must pass requires showing that Kimball "suffered from an objectively serious medical need," by demonstrating that Kimball's medical need was either "supported by medical evidence, such as a physician's diagnosis," or was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Ryan*, 850 F.3d at 425. The Eighth Circuit has made clear that "an officer does not lose the protections of qualified immunity merely because he does not react to all symptoms that accompany intoxication." *Thompson*, 730 F.3d at 748. For example, in *Grayson v. Ross*, the Eighth Circuit found that an intoxicated arrestee did not present an objectively serious medical need, despite clear methamphetamine intoxication. 454 F.3d 802 (8th Cir. 2006). The court reasoned: "Confronted with a calm, non-combative person

sitting on a bench answering questions, a layperson would not leap to the conclusion that Grayson needed medical attention, even if he were aware that Grayson had taken methamphetamine." *Id.* at 810. By contrast, the Eighth Circuit has found an objectively serious medical need where an arrestee "could not answer questions and could not remain seated without falling over." *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016).

Here, there is no question that Kimball's medical need was not "supported by medical evidence, such as a physician's diagnosis." *Ryan*, 850 F.3d at 425. Rather, the parties dispute whether Kimball's medical need was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* Even viewing the record in the light most favorable to Kelley, the Court finds that the record does not support Kelley's contention that Kimball was suffering from an objectively serious medical need obvious to a layperson prior to 6:32 am, when the officers first noticed blood on his bed and responded promptly by calling an ambulance.

At the time of Kimball's booking, a layperson would not have easily recognized that Kimball needed medical attention. To be sure, a layperson would have recognized that Kimball was intoxicated. In the booking room, Kimball was "sweating excessively and twitching." (Medical Screening Form 2; Hauser Dep. 24, 30-31.) Officer Pulford testified that Kimball's behavior—"fidgety, the twitching, the sweating"—was "consistent with almost anyone who had recently used meth." (Pulford Dep. 23-24.) The jail's surveillance video similarly shows that Kimball was fidgety or jittery throughout the booking process, and his shoulders and neck frequently twitched. (*See generally* Jail Video, Camera 8.) And

the correctional officers were explicitly told that Kimball had used methamphetamine. (Hauser Dep. 24; Ibberson Dep. 19-20.)

A layperson, however, would not have easily recognized that Kimball was experiencing a medical emergency. Although he appeared intoxicated, Kimball was "able to communicate coherently." (Pulford Dep. 22.) Officer Wiens described some of Kimball's behavior as typical for anxious arrestees. (Wiens Dep. 41.) He was not going unconscious, was giving coherent answers to questions, did not appear to be hallucinating, and was not having seizures or vomiting. (Hauser Dep. 56.) Kimball was able to walk unassisted, and was cooperative. (*Id.* at 30, 61; *see* Jail Video, Camera 8.) And the correctional officers were not told how much methamphetamine Kimball had used, or when he had used it. (Hauser Dep. 60-61.)

Nor was Kimball's medical need easily recognizable by a layperson while he was in the jail's holding cell. From 12:30 am to approximately 3:30 am, Kimball was either lying on the bed or up drinking water. (Activity Log 2.) Neither Officer Hauser nor Officer Pulford saw anything concerning in Kimball's behavior during this time. (Hauser Dep. 58; Pulford Dep. 40.) From approximately 3:30 am to 6:00 am, Kimball became more active. Officers Pulford and Hauser noted that he was "kicking the air," that he "spit on the floor," that he was "laying on stomach, moving legs," "sitting on bed rocking," and, briefly, "laying on cell floor." (Activity Log 2.) Kimball's shift in behavior was concerning enough that Officer Hauser called the New Ulm Medical Center's emergency room to determine when she should "be concerned about someone who is high on Meth." (*Id.*) Kimball's behavior was certainly concerning. But it was not so severe that a layperson "would easily

recognize" that Kimball was facing a methamphetamine overdose requiring immediate medical attention, nor did the New Ulm Medical Center nurse suggest otherwise.

By contrast, from 6:00 am to 6:32 am, Kimball was observed lying face-up on the cell floor. (*Id.*) His chest was rising, his feet were moving, and his eyes were opening and closing. (*Id.*) Then, at 6:32 am, Officer Pulford observed "some sort of vomit or clear liquid mixed with some blood" on Kimball's bed. (Pulford Dep. 43.) At that time, Kimball's need for emergency medical care was obvious to a layperson. And at that time, Officers Pulford and Hauser promptly called an ambulance and administered first-aid. (Activity Log 2; Pulford Dep. 48-49; Hauser Dep. 64; Byro Incident Report 2.) Paramedics arrived shortly after, at 6:37 am. (Activity Log 2.)

Thus, based on the undisputed facts in the record and viewing the evidence in the light most favorable to Kelley, Kimball was not suffering from an objectively serious medical need obvious to a layperson until approximately 6:32 am, when Officers Pulford and Hauser promptly called for an ambulance.

### 2. Defendants' Actual Knowledge and Deliberate Disregard for Kimball's Medical Need

Even if Kimball were suffering from an objectively serious medical need obvious to a layperson prior to the time when Officers Pulford and Hauser called for an ambulance, the record does not show that any of the officers actually knew of that need and deliberately disregarded it. Because this prong of the analysis requires an independent assessment of each defendant's conduct, the Court will treat Officers Pulford, Hauser, and Wiens separately. *See Wilson*, 441 F.3d at 591. The Court begins with Officer Hauser.

### a.    Officer Hauser

The Court finds that the undisputed facts in the record do not support Kelley's contention that Officer Hauser had actual knowledge of Kimball's medical need but deliberately disregarded it. Officer Hauser knew Kimball was intoxicated, and believed he had been using methamphetamine. In fact, it was Officer Hauser who noted on Kimball's medical screening form that he "appear[ed] to be under the influence of alcohol/drug," specifically "[m]eth." (Medical Screening Form 2; Hauser Dep. 23.) Officer Hauser testified that Kimball displayed "visual indicators that he was under the influence," including "sweating" and "twitching." (Hauser Dep. 24, 30-31.) And she knew from Officer Ibberson that Kimball had been using methamphetamine. (*Id.* at 24.)

Nevertheless, Officer Hauser did not believe Kimball was suffering a medical emergency. He was not going unconscious, was giving coherent answers to questions, did not appear to be hallucinating, and was not having seizures or vomiting. (*Id.* at 56.) Moreover, Officer Hauser was not told how much methamphetamine Kimball had used, or when he had used it. (*Id.* at 60-61.) In *Grayson*, the Eighth Circuit held that a defendant correctional officer did not have actual knowledge of the arrestee's medical need in part because the officer "did not know the amount of methamphetamine taken or the time that it was taken." 454 F.3d at 810. Although Officer Hauser did not offer Kimball a phone call due to his intoxication, she did not decline to offer the call because he was too intoxicated to make a phone call. (*Id.* at 25.) To the contrary, Officer Pulford testified that Kimball was able to have a "coherent conversation" and "probably could have" made a phone call, and the officers decided to delay offering the call until he was sober as a "courtesy." (Pulford

Dep. 29-31; Hauser Dep. 25.) And during the first three hours of Kimball's detention in the holding cell, Officer Hauser testified that she did not see anything that made her believe he had a serious medical issue. (Hauser Dep. 58.)

Notably, Officer Hauser called the New Ulm Medical Center's emergency room at 4:30 am, and asked the nurse "at what point in time did I need to be concerned about someone who is high on Meth." (Activity Log 2.) The nurse told her that "as long as he was coherent and not running a fever he was going to twitch." (*Id.*) Although this phone call indicates that Officer Hauser was concerned by Kimball's behavior, it does not establish that she had actual knowledge that he was in immediate medical distress.

Moreover, the record does not show that Officer Hauser deliberately disregarded Kimball's needs. The deliberate disregard standard is a high one. *Saylor*, 812 F.3d at 644. It requires more than even gross negligence. *Ryan*, 850 F.3d at 425. To establish deliberate disregard, a plaintiff must show "a mental state akin to criminal recklessness." *Id.* To be sure, Officer Hauser did not follow up on the nurse's comments. She never took Kimball's temperature to check for fever. (Hauser Dep. 50-51, 54-55.) Nor did she attempt to speak to Kimball to determine whether he was still coherent. (*Id.* at 50-51.) Rather, Officer Hauser testified that she regarded the nurse's instruction as "[p]recautionary," not "as direction." (*Id.* at 53-54.) Nonetheless, Officer Hauser believed Kimball was not feverish "[b]ecause he was drinking water and he was up moving around," and she believed Kimball was coherent because "[h]e was up and moving around. He looked like he was coherent." (Hauser Dep. 50, 53.) At most, Officer Hauser's judgment that Kimball was coherent and not feverish, without confirming so, was negligent or even grossly negligent. However,

25

Officer Hauser's failure to follow through with the nurse's instructions does not show a mental state akin to criminal recklessness.

Kelley relies on the Eighth Circuit's opinion in *Ryan v. Armstrong*, where the Eighth Circuit reversed the district court's grant of summary judgment based on qualified immunity. 850 F.3d 419. Kelley interprets *Ryan* as holding "that the officers' failure to talk to the detainee or seek medical treatment for him was a clearly inadequate response that supports an inference of deliberate indifference." (Plf.'s Mem. Opp. Def.'s Mot. Summ. J. [Doc. No. 39], at 14 n.1.) But in *Ryan*, the defendant correctional officers allowed an arrestee to "scream, howl, and bang against his cell door for eight hours without attempting to talk to him or seek medical intervention." *Ryan*, 850 F.3d at 426. By contrast, Kimball appears to have slept for much of his approximately six-hour detention in the holding cell. Even when Kimball became more active, by kicking the air and wall, there is no evidence in the record that he screamed, howled, or otherwise acted violently. And when Kimball did present clear signs of medical distress, Officers Pulford and Hauser summoned an ambulance and administered first-aid.

In sum, the Court finds that, viewing the evidence in the light most favorable to Kelley, the undisputed facts in the record do not show that Officer Hauser had actual knowledge of and deliberately disregarded Kimball's medical need.

### b.    Officer Pulford

Similarly, the undisputed facts in the record do not support Kelley's contention that Officer Pulford had actual knowledge that Kimball was suffering from an immediate medical need. Like Officer Hauser, Officer Pulford believed that Kimball "looked

consistent with somebody that had used methamphetamine and that was not in any sort of a medical emergency." (Pulford Dep. 32.) Officer Pulford testified that until 4:00 am, he did not see any aggressive or concerning behaviors, and he did not see anything that would indicate that he should contact a nurse or doctor. (*Id.* at 40.) In addition, Officer Pulford stated that did not see Kimball put anything in his mouth or dig around in his clothing, and he observed Kimball getting up and drinking water "throughout a long period of time." (*Id.* at 40-41.) Even when Kimball became more active after 3:47 am, Officer Pulford believed Kimball "was still fine," and he did not believe that Kimball's physical movements indicated an immediate, serious medical condition. (*Id.* at 42, 51.)

As with Officer Hauser, the record does not show that Officer Pulford deliberately disregarded Kimball's medical needs. Officer Pulford was aware of Officer Hauser's call to the nurse, and did no more to follow up on that call than Officer Hauser. (*Id.* at 51-52.) However, there is no evidence in the record that Officer Pulford's omission was motivated by bad faith. Like Officer Hauser, Officer Pulford's judgment not to follow up on the nurse's instructions amounts, at most, to negligence or gross negligence. The record, viewed in the light most favorable to Kelley, does not establish that Officer Pulford acted with the culpable state of mind necessary to meet the "extremely high standard" of deliberate disregard. *Saylor*, 812 F.3d at 644.

### c.    Officer Wiens

Finally, the undisputed facts in the record do not support Kelley's contention that Officer Wiens had actual knowledge that Kimball was suffering from an immediate need for medical care but deliberately disregarded that need. Officer Wiens testified she

27

believed, at the time, that "it didn't appear to be an immediate medical emergency." (Wiens Dep. 40.) Later, in her deposition, Officer Wiens reconsidered her judgment at the time and testified that "I do believe at that time he needed – probably needed – at least call the ER and find out." (*Id.* at 64.) It is clear, however, that her judgment, at the time of her deposition, was made with the benefit of hindsight. Officer Wiens explained, "watching the video . . . now, yes, he should have had medical attention. However, back then, we didn't know the extent to it. So that's why we put him in the holding cell, so we can observe him." (*Id.* at 65.)

Thus, Officer Wiens' testimony does not support a finding that Officer Wiens, at the time of Kimball's booking and detention, actually knew that Kimball was suffering a medical emergency and deliberately disregarded it. At most, it shows that the officers' judgments at the time may have been negligent. There is simply no evidence that they acted knowingly with deliberate disregard for Kimball's medical needs. Moreover, Officer Wiens finished her shift at 3:00 am, before Kimball became more active, before Officer Hauser's call to the New Ulm Medical Center, and well before Kimball was found unconscious on the cell floor. (Wiens Dep. 22.) There is no evidence in the record to suggest that Officer Wiens acted with a mental state akin to criminal recklessness.

### 3.   Conclusion

In sum, viewing the undisputed facts in a light most favorable to Kelley, the Court finds that the record does not support Kelley's contention that Kimball was suffering from an objectively serious medical need prior to the time Officers Pulford and Hauser called an ambulance and that the record does not support Kelley's contention that Officers Pulford,

Hauser, and Wiens had actual knowledge of Kimball's medical emergency but deliberately disregarded those medical needs. Accordingly, Defendants are entitled to qualified immunity because there is no evidence in the record that they violated any constitutional right under the Fourteenth Amendment.

### D.   *Monell* Claim

Kelley also asserts a section 1983 *Monell* claim against Brown County Sheriff Rich Hoffman. Under *Monell v. Department of Social Services*, a county may be subject to § 1983 liability if "action pursuant to official [county] policy . . . caused a constitutional tort." 436 U.S. 658, 691 (1978). But "[w]ithout a constitutional violation by the individual officers, there can be no § 1983 or *Monell* . . . liability." *Stockley v. Joyce*, 963 F.3d 809, 823 (8th Cir. 2020) (quoting *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007)); *see also Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018) ("[A]bsent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City." (collecting authorities)). As explained above, Officers Pulford, Hauser, and Wiens were not deliberately indifferent to an objectively serious medical need. Accordingly, Officers Pulford, Hauser, and Wiens did not violate Kimball's constitutional rights, and Brown County cannot be liable under a *Monell* theory of liability. Therefore, Defendants are entitled to summary judgment on the *Monell* claim as well.

### E.   Wrongful Death Claim

Finally, Kelley asserts a state law wrongful death claim. Defendants argue that they are entitled to summary judgment on Kelley's wrongful death claim because official immunity bars the claim and because Kimball's death was not foreseeable. The Court

agrees that Kelley's wrongful death claim is barred by official immunity. "Under Minnesota law, a public official is entitled to official immunity from state law claims when the official's duties require the exercise of discretion or judgment." *Dokman v. Cty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (citing *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)). In analyzing an official's claim to immunity, the Court asks (1) whether the official's challenged acts were discretionary or ministerial, and (2) whether the challenged acts, "even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection." *Id.* (citing *Davis v. Hennepin County*, 559 N.W.2d 117, 122 (Minn. Ct. App. 1997)); *see Elwood v. Rice Cty.*, 423 N.W.2d 671, 677 (Minn. 1988).

Defendants' challenged conduct was discretionary, not ministerial, and therefore entitled to official immunity. "A discretionary act is one for which an official must exercise 'judgment or discretion.'" *Dockman*, 637 N.W.2d at 296 (quoting *Johnson v. State*, 553 N.W.2d 40, 46 (Minn. 1996)). By contrast, a ministerial act "involves merely the execution of a specific, absolute duty." *Id.* (citing *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998)). Defendants' decision to book Kimball into the Brown County Jail despite his intoxication, and their decisions regarding whether and when to seek emergency medical attention for him, were acts requiring judgment or discretion. Thus, Defendants are entitled to official immunity unless their conduct was malicious or willful.

The record is devoid of any evidence that Defendants acted out of malice. For purposes of official immunity, malice "means intentionally committing an act that the official has reason to believe is legally prohibited." *Kelly v. City of Minneapolis*, 598

N.W.2d 657, 663 (Minn. 1999). A finding of malice "must be based on 'specific facts evidencing bad faith.'" *Semler v. Klang*, 743 N.W.2d 273, 279 (Minn. Ct. App. 2007) (quoting *Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn. Ct. App. 1990)). Here, Kelley has identified no "specific facts evidencing bad faith." *Id.* For the same reasons that the Court found that Officers Pulford, Hauser, and Wiens were not deliberately indifferent to Kimball's medical needs, the Court finds that the record is devoid of evidence that the officers willfully withheld medical care out of malice. Although Officers Pulford, Hauser, and Wiens may have been negligent, perhaps even grossly negligent, there is no evidence in the record indicating that the officers acted in bad faith or intentionally deprived Kimball of necessary medical care. Accordingly, Officers Pulford, Hauser, and Wiens are entitled to official immunity.

Moreover, Brown County is entitled to vicarious official immunity. A county employer is generally entitled to vicarious official immunity when its employees are found to have official immunity. *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998). Because Brown County's liability arises from the same conduct for which the Court found Officers Pulford, Hauser, and Wiens immune, the Court holds that Brown County is entitled to vicarious official immunity.

Accordingly, Defendants are entitled to summary judgment on Kelley's wrongful death claim. Because the Court finds that Defendants are entitled to official immunity, it need not address Defendants' argument that Kimball's death was not foreseeable.

### III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 27] is **GRANTED**, and Defendants' Motion to Exclude Expert Testimony [Doc. No. 32] is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 14, 2020                                 s/Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge